McCALEB, Justice.
 

 This controversy grows out of the leasing of a crane by the plaintiff contracting company to the defendant. Each party claims that the other has defaulted in its obligation and that it has sustained damage
 
 *552
 
 as a result. The events which brought about the dispute are as follows:
 

 On December 10, 1943, plaintiff leased to the defendant, a corporation engaged in a house building enterprise in the Third District of the City of New Orleans, a diesel driven dragline (or crane), a hopper plant including scales and a concrete mixer for the sum of $1500 a month with a minimum rental guarantee of two months. Immediately after the crane had been put to use by defendant, its starter broke and, following a disagreement between the parties as to whether the starter was defective or whether defendant’s mechanic had stripped it, plaintiff agreed to allow defendant to use another crane of the same make (Koehring), which was driven by gasoline instead of diesel oil. Defendant accordingly obtained the crane and put it to work at the housing project. This was in December 1943 but it was not long before labor trouble occurred which had considerable effect upon the events which follow.
 

 It appears that defendant had been employing non-union labor at its project, whereas, plaintiff was an employer of union labor. In January 1944, the New Orleans Building and Construction Trades Council sent a telegram to plaintiff advising it that the Council had voted to withdraw all union labor from all of its jobs unless the equipment rented to defendant was taken off of defendant’s project. As soon as plaintiff was advised of the attitude of the'labor union, it contacted the defendant but the latter insisted on keeping the equipment. Subsequently on February 24, 1944, after many conferences between plaintiff, defendant and the labor union, plaintiff agreed to an extension of the lease to March 10th 1944 but insisted upon the return of its machinery on that day. However, defendant did not return the crane on March 10th, and it remained in defendant’s use and possession until April 22nd, when plaintiff went upon defendant’s land and removed it.
 

 After plaintiff had retrieved the crane from defendant’s property, many claims and counter-claims were made by the parties against each other. Defendant was much aggrieved by plaintiff’s action and plaintiff claimed that it was damaged because defendant had failed to return the crane upon request. Finally, on April 29, 1944, the parties composed their differences by an agreement of compromise. This contract recited, in substance, that, whereas a dispute had arisen respecting the term of the rental agreement of December 10, 1943, the parties, in order to settle their differences and to eliminate the possibility of litigation, agreed that
 

 (1) A “P & H” Crane (which was a much heavier crane) would be substituted for the “Koehring” crane which had been removed by plaintiff;
 

 (2) That plaintiff would construct mats on which the heavier crane would run and that the construction cost of these mats would be borne equally by the parties;
 

 
 *554
 
 (3) That the rental agreement, as amended, would expire on June 10, 1944, and that credit for rental would be given to defendant for the delay resulting from the construction of the mats. In other words, defendant would be given credit for $50 per day on account of the $1500 monthly rental for each day the crane could not be used during the time the mats were being constructed.
 

 After defendant had signed the compromise contract, its attorney, by letter of May 3, 1944, addressed to the attorney for plaintiff, stated that, whereas he had approved the contract, he would like to supplement it with certain stipulations concerning the acceptance of the P & H Crane to be furnished to defendant. The substance of these stipulations, which were ^approved by plaintiff, is as follows:
 

 (1) That the crane would not be finally accepted by the defendant until it had been operated at defendant’s site for a period of three hours on the mats which were to be constructed by plaintiff. (It was stated in the letter of defendant’s attorney that Mr. Wilson, defendant’s contractor, had examined the machine; that it appeared to be in good order but that it was feared that, because of its weight, it could not be fully operated unless it was run on mats) ;
 

 • (2) That representatives of the plaintiff would be required to place the machine on the mats at the site where it was to be used as Mr. Wilson was not willing to assume this responsibility because of the heavy and unusual weight of the machine, and
 

 (3) That, at the termination of the lease, plaintiff would be required to move the machine from the site at its own expense.
 

 After the crane had been delivered to defendant’s project by plaintiff, defendant refused to pay the rental thereon, contending that the machine was not in good working order and unfit for the purpose for which it was leased.
 

 Plaintiff, on the other hand, maintained that the crane had been tested in accordance with the supplemental agreement of May 3, 1944, and that it had complied with all of the obligations imposed upon it by the 'lease. Thereafter, plaintiff brought this suit to recover rent and other damages sustained by it, allegedly resulting from defendant’s breach of contract. The items of damage, amounting to the total of $6611.14, claimed by plaintiff in its petition are
 

 (a) $650, representing rent due by defendant for use of the “Koehring” crane from April 10th through April 22nd at $50 per day;
 

 (b) $1500, rent of “P & H” Crane from May 10 to June 10, 1944;
 

 (c) $1500, loss of use of P & H Crane for additional month due to defendant’s failure to return the equipment;
 

 (d) $2100, damages resulting from defendant’s refusal to deliver the concrete
 
 *555
 
 mixer to plaintiff for six months, despite repeated demands. (This item is based on a rental for the mixer of $350 per month) ;
 

 (e) $350, representing damage to the concrete mixer resulting from defendant’s failure to keep it in good order;
 

 (f) $162, damages sustained to the “P & H” Crane while in defendant’s possession, and
 

 (g) $349.14, representing one-half of the actual cost of construction of the mats provided for in the compromise agreement of April 29, 1944.
 

 Defendant resisted the demand on the ground that the compromise agreement was conditioned upon plaintiff’s representation that the “P & H” Crane would be in good mechanical working order and fit for the purposes for which it was rented; that the crane was never in good order and that, therefore, the consideration failed. Defendant, however, admitted that it was indebted to plaintiff in the sum of $650 for rent of the “Koehring” crane from April 10 to April 22, 1944, and also that it owed plaintiff the sum of $350 for use of the concrete mixer for one month for which rent had not been paid.
 

 Defendant also filed a reconventional demand in which it alleged that, due to the failure of plaintiff to furnish a crane in good working order, as provided by the compromise agreement, that agreement was null and it was, therefore, entitled to recover the damages which it had sustained by virtue of plaintiff’s alleged breach of the original lease. It further took the position that it was entitled to other damages sustained by it because of plaintiff’s alleged failure to furnish a crane in good working order, as required by the compromise agreement. The total damages claimed by defendant amounts to $9850.07.
 

 After hearing the evidence adduced by the litigants in support of their respective contentions, the District Judge rendered judgment dismissing defendant’s reconventional demand and awarding plaintiff $2849.14. Defendant has appealed. Plaintiff has answered the appeal, claiming that the judgment in its favor should be increased to the amount prayed 'for in its petition.
 

 The foregoing statement of the case reveals that the salient question presented for determination is one of pure fact, — viz., whether the “P & H” Crane furnished by plaintiff was in good mechanical order and suitable for the purpose for which it was leased. The crane is shown to be a very large one, weighing approximately fifty tons, having a boom length of 75 feet and a capacity of 2(4 to 3 cubic yards, whereas, the previous “Koehring” crane used by defendant weighed between twenty and twenty-five tons, had a boom length of 50 feet and a capacity of
 
 %
 
 of a yard. This difference in size was taken into consideration by the defendant at the time it entered into the compromise agreement of April 29, 1944, because it is shown in that agree
 
 *558
 
 ment that, due to the weight of the machine, mats would be required in order to move it over the soft ground of the building project. It also seems clear that defendant’s representative, Mr. Bert Wilson, the •contractor in charge of the building operations, anticipated that defendant’s crane engineer might encounter difficulty in operating the large “P & H” crane. It was apparently due to Wilson’s doubts that defendant’s attorney wrote to plaintiff’s attorney, on May 3rd, insisting that the compromise of April 29th be supplemented by providing that the machine would not be finally accepted by defendant until it had been operated for three hours at the location where it was to be put to use on the mats which were to be constructed. This letter, however, shows that Mr. Wilson had examined the crane for it is stated therein that “the representative of Pittman Bros, and Mr. Wilson both agree that the machine appeared to be in order * *
 

 In support of its contention that it has fully complied with its agreement, plaintiff offered the testimony of its Manager, Mr. G. A. Richard, its President, Mr. Pittman, a shipbuilder,'Mr. Mayo Canulette and an operating engineer, Mr. William Mealer.
 

 Mr. Richard testified that, after the mats were constructed, the crane operated by a Mr. Allen (an employee of plaintiff whose whereabouts were unknown at the time of the trial) was moved to defendant’s project; that, when the equipment arrived (on or about May 8th 1944), the bucket had to be installed as it had been previously detached from the crane while it was being used for another purpose; that it took approximately one-half day to install the bucket; that, after it was installed, the mats were laid and the machine placed in position and that, thereafter, the engineer took material with the bucket and placed it in the hopper; that the test continued for a full three hours and that the machine functioned satisfactorily during the test. He further says that Mr. Wilson was present at the time the test was made.
 

 Mr. Mayo Canulette asserted that he had operated the same “P & H” crane from April 1943 to January 1944, twelve or fourteen hours per day for seven days a week without difficulty other than normal wear and tear.
 

 Mr. T. A. Pittman, President of plaintiff company, stated that the “P & H” crane had been used by plaintiff on a job for the Delta Shipyard, doing the same kind of work as that contemplated by the defendant and that, after the crane was taken from defendant’s project, it was employed on one of his own projects without the necessity of making any repairs.
 

 Mr. William Mealer declared that he is a crane operating engineer; that he has driven all types and kinds of cranes; that he operated the “P & H” crane at the Canulette Shipyard in the latter part of 1943 and on the “Loumet” -project in 1944
 
 *560
 
 and that he found it operating satisfactorily on all occasions.
 

 Opposed to the testimony submitted by plaintiff is that of Mr. Bert Wilson, contractor for defendant’s project and Mr. M. E. Whitescarver, its crane operator.
 

 Mr. Whitescarver stated that he attempted to operate the “P & H” crane but that it would not work; that it would not lift sand and gravel into the hopper; that its bearings were worn out; that he could not get it to swing; that it would “freeze up” on the shaft; that its motor was hitting on two cylinders only; that, although new spark plugs were placed in the motor, no improvement was shown in its operation; that the valves needed attention and that all of the grease fittings were broken. On cross-examination, however, this witness conceded that, if the crane had been equipped with a heavier bucket, i. e., to 3 cubic yards instead of the light % of a yard capacity used by defendant, it would have probably operated satisfactorily. He does not explain why he did not report this to Mr. Wilson, his employer, merely remarking that it was not any of his business.
 

 Mr. Wilson’s testimony is substantially in accord with that given by Mr. Whites-carver and he further says that he was not present at the time the tests of the machine were made by plaintiff.
 

 It is obvious that the District Judge, in finding for the plaintiff, felt that the evidence tendered by it clearly preponderated over that of the defendant. After a careful review of conflicting testimony, we are unable to say that the resolution of the Judge on the facts of the case is manifestly wrong.
 
 [1]
 
 In truth, a searching analysis of Mr. Whitescarver’s statement leads us toward the conclusion that he either did not care to operate the heavy “P & H” crane or that he was not an expert as he claimed to be.
 

 Since we agree with the District Judge that plaintiff is entitled to redress, we direct our attention to the amount of the judgment appealed from ($2849.14) as it is contended by both parties that the award is incorrect. Although plaintiff claims in its answer to the appeal that the award should be increased to the amount for which suit was brought, its counsel have frankly conceded in their brief that some of the items’demanded have not been proved. They, however, maintain that the judge erred in not permitting recovery for the alleged damage to the concrete mixer, amounting ta $350, and also for the sum of $2100, representing six months rent for the mixer dating from
 
 *562
 
 the time it should have been returned by-defendant.
 

 We have examined the evidence which is said to support the foregoing items and find it to be too vague and uncertain to sustain a judgment in plaintiff’s favor. Evidently, the Court below entertained the same view.
 

 On the other hand, we believe that the District Judge erred in permitting plaintiff to recover the full sum of $1500 for rent of the crane and other equipment for the month ending June 10, 1944, when $350 of this amount was apparently allowed as rental for the concrete mixer for the same month.
 

 The judgment rendered by the District Court includes the two items of $650 and $350 admittedly due by defendant. The Judge, in allowing plaintiff recovery for the rental of the crane, hopper and mixer for the month ending June 10, 1944, should have taken into consideration the fact that he was permitting recovery for part of the rent due, i. e., the amount of $350, representing the rental of the mixer, which would have been normally included in the $1500 monthly rent. The allowance of the full amount is tantamount to an overcharge of $350 and the judgment will therefore be reduced so as to disallow that sum. However, since defendant failed to direct the judge’s attention to the error by application for a new trial, we think that it should bear the costs of appeal.
 

 For the reasons assigned, the judgment appealed from is amended by reducing the amount thereof to the sum of $2499.14 and, as thus amended, it is affirmed. Defendant and appellant is to pay the costs of appeal.
 

 [1]
 

 The settled jurisprudence of this state is that the appellate courts will not reverse the ruling of the trial court on a luestion of fact unless it finds the conelusion to be obviously erroneous. Davis v. Teche Lines, Inc., 200 La. 1,
 
 7
 
 So.2d 365; McGee v. Yazoo & M. V. R Co., 206 La. 121, 19 So.2d 21.